# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN
# MADISON DIVISION

| | |
|---|---|
| FG, LLC, individually and on behalf of others similarly situated, ) ) ) ) **Plaintiff,** ) ) v. ) ) THE PHOENIX INSURANCE COMPANY, ) ) ) **Defendant.** ) ) | Civil Action No.: 3:23-cv-00168 **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff FG, LLC and for its Complaint against The Phoenix Insurance Company, states and alleges the following:

### PARTIES, RESIDENCY, JURISDICTION AND VENUE

1. Plaintiff FG, LLC ("Plaintiff") is a single-member California limited liability company and maintains its principal place of business at 2940 Westwood Blvd., 2nd Floor, Los Angeles, California 90064. Plaintiff has one member, which is another California limited liability company which has two members, both of whom are citizens and residents of California.

2. At all times relevant hereto, Plaintiff was the owner of structures (a shopping center) located at 750-800 N. Union Street, Mauston, Wisconsin 53948 (the "Insured Property").

3. Defendant The Phoenix Insurance Company ("Defendant") is an insurance company organized and existing under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut. Defendant is a subsidiary underwriting company for The

Travelers Companies, Inc. Defendant is licensed to sell property insurance policies in the State of Wisconsin, including in this judicial district.

4. Plaintiff's Complaint originates as a result of a hail storm that damaged the Insured Property, and Defendant's unlawful actions in refusing to pay, in full, all amounts owed to Plaintiff pursuant to the subject insurance policy.

5. This Court has personal jurisdiction over Defendant because Defendant contracts to insure property and risks in Wisconsin, transacts business in Wisconsin, enters into contracts in Wisconsin, committed the acts at issue in this lawsuit in Wisconsin, and otherwise has sufficient minimum contacts with the State of Wisconsin.

6. Complete diversity of citizenship exists pursuant to 28 U.S.C. § 1332 and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Venue is proper in this Court because the Insured Premises giving rise to the insurance dispute in controversy is located in Juneau County, Wisconsin.

**FACTUAL BACKGROUND**

**A. The Insurance Policy**

7. At all times relevant hereto, Plaintiff was insured pursuant to an insurance contract whereby Defendant agreed to insure the structures located at the Insured Property against property damage, bearing Policy No. 680-7g619855-21-42 (the "Policy").

8. A copy of the Policy is attached as **Exhibit 1**.

9. The relevant term of the Policy was February 4, 2021 to February 4, 2022.

10. A all times relevant hereto, the Insured Property consisted of improvements, structures, and surrounding area (a shopping center) located at and around 750-800 N. Union Street, Mauston, Wisconsin 53948.

11. At the time of the Loss (as defined below), Plaintiff owned the Insured Property.

12. The Policy provided insurance coverage for "direct physical loss of or damage to" the structures located on the Insured Property. The Policy is an "all risk" policy, providing coverage for all direct physical loss of, or damage to, covered property unless the loss is specifically excluded or limited by the Policy.

13. The Policy's coverage for the buildings and structures located on the Insured Property was on a "replacement cost" basis. However, the Policy provides for a two-step settlement process by which Defendant first pays the "actual cash value" (the depreciated value) and then releases the depreciation, *i.e.*, the holdback, if and when the work is performed. Further, the policyholder is given the option to only make a claim on an actual cash value basis.

14. Under the Policy terms, ACV payments for structural loss are calculated by Defendant and paid prospectively, before damaged property is actually repaired or replaced.

15. While the term "actual cash value" is undefined in the Policy, the Policy's provisions, including but not limited to the loss settlement payment provisions, contemplate that "actual cash value" will be calculated for structural losses pursuant to the "replacement cost less depreciation" methodology ("RCLD"). *See generally Coppins v. Allstate Indemn. Co.*, 857 N.W.2d 896, 201 (Wis. Ct. App. 2014).

**B. The Loss**

16. On or about May 2, 2021, the structures located on the Insured Property suffered structural damage as a result of a storm involving hail (the "Loss"), requiring replacement and/or repair.

17. Plaintiff submitted a claim to Defendant requesting payment for the covered loss.

18. The Policy was in effect at the time of the Loss.

19. The Loss constituted a compensable claim under the terms of the Policy.

20. No applicable exclusion excluded the entire Loss.

21. Pursuant to Federal Rule of Civil Procedure 9(c), all conditions precedent have occurred or been performed.

22. On or about January 6, 2023, Defendant issued an actual cash value ("ACV") payment to Plaintiff.

23. Defendant affirmatively and unilaterally chose to calculate the January 6, 2023 ACV payment exclusively through the RCLD methodology.

24. Defendant did not use any other methodology to calculate Plaintiff's ACV payments.

25. Plaintiff agrees that the RCLD methodology chosen by Defendant to calculate ACV was the appropriate methodology to use to calculate ACV for the Loss.

26. By making an ACV payment to the Plaintiff based solely upon the use of the RCLD methodology, Defendant has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the RCLD methodology actually used by Defendant.

C. **The Xactimate® Estimate**

27. Defendant used commercially available computer software, known as Xactimate®, to make its RCV, depreciation, and ACV calculations.

28. Xactimate® exclusively uses the RCLD methodology to calculate ACV for structural losses.

29. Utilizing Xactimate®, Defendant calculated the RCV of Plaintiff's covered loss at $2,046,283.02, plus an additional $584,816.92 for code upgrades.

30. Defendant sent Plaintiff a copy of the computer-generated Xactimate® estimate reflecting its RCV calculations.

31. Defendant's estimate included the cost of materials and labor required to complete repairs.

32. A copy of the estimate is attached hereto as **Exhibit 2.**

33. Utilizing Xactimate®, Defendant calculated depreciation in the amount of $883,832.35.

34. After subtraction of the depreciation from the RCV, and also subtraction of the applicable deductible of $5,000.00, Defendant made an ACV payment to Plaintiff in the amount of $1,157,450.67. The payment was made in the form of two checks dated January 6, 2023 in the amounts of $1,000,000.67 and $157,450.00, copies of which are attached hereto as **Exhibit 3**.

35. Additionally, Defendant sent Plaintiff an email on January 6, 2023 confirming the issuance of the ACV payment. *See* **Exhibit 4** (Email from Jeffrey P. Calderone, Travelers, to Plaintiff's counsel (Jan. 6, 2023) ("at this time we are proceeding with payment on the undisputed ACV based on the attached estimate…. Payment totals: $1,157,450.67 – This was sent in the form of two checks…. Payment 1 - $1,000,000.67 Payment 2 - $157,450")).

36. In addition to the written Xactimate® estimate, Defendant also provided Plaintiff with a written "Statement of Loss" that itemized its calculation of RCV, depreciation, and ACV, a copy of which is attached as **Exhibit 5**.

**D. Depreciation Of Labor**

37. "Labor," as used in this Complaint, means the future labor (specifically including both the labor costs and the laborers' equipment costs and contractors/laborers' overhead and profit) that is estimated to be necessary to restore structural property to its condition *status quo*

*ante*, as well as the removal costs to remove damaged property, under Xactimate® estimating software.

38.     This lawsuit does *not* seek to address the propriety of depreciating any labor "embedded" within a building product. Plaintiff does not dispute that both labor and materials incurred to create a building product becomes integrated with the home or building and may be depreciated following a casualty loss as part of the calculation of ACV benefits. *See Walker v. Auto-Owners Ins. Co.*, 517 P.3d 617, 620 n.1 (Ariz. 2022).

39.     However, when Defendant calculated Plaintiff's ACV benefits owed under the Policy, Defendant withheld costs for both the materials and *future* labor required to repair or replace the Plaintiff's building as depreciation, even though the future labor Defendant depreciated had not yet been incurred.

40.     Like all property insurance claims estimating software, Xactimate® allows for the depreciation of materials only or the depreciation of both material and future labor costs in its depreciation option setting preferences. These settings can be adjusted by simply checking or unchecking a box with a computer mouse. For example, the below screenshot from the Xactimate® program shows than an insurer can choose to select or de-select "Depreciate Non-Material," "Depreciate Removal," and "Depreciate Overhead and Profit," all of which are labor items.



41.     In an email to Plaintiff's counsel dated December 22, 2022, attached as **Exhibit 6**, Defendant's adjuster confirmed that Defendant withheld "labor / general conditions / O&P" as depreciation from Plaintiff's ACV payments.

6

42. In an email to Plaintiff's counsel dated January 6, 2023, (**Exhibit 4**), Defendant's adjuster once again confirmed that labor costs were being withheld from the ACV payments processed and mailed to Plaintiff by Defendant on that same date.

43. Plaintiff requested that Defendant recalculate its ACV payment obligations without depreciating labor, but Defendant refused. Instead, Defendant advised that it "did take a look and our position has not changed. We are not aware of any laws that prohibit depreciation from being withheld on labor in Wisconsin." See **Exhibit 7** (email from Defendant's adjuster dated January 26, 2023).

44. Without expert assistance, Plaintiff itself cannot determine the precise amount of future labor that has been withheld based only upon the written estimate provided. To determine the precise amount of future labor withheld, it is necessary to have access to the commercial property estimating program at issue (Xactimate®), as well as the electronic file associated with the estimate.

45. Plaintiff disputes whether portions of the agreed-to and undisputed amounts of labor, as determined by Defendant itself, may be withheld by Defendant as "depreciation" from its ACV payment under the terms and conditions of the Policy, including but not limited to depriving Plaintiff of the time use of money resulting from the time periods of labor withholdings in the form of prejudgment interest.

46. There is no dispute as to the values of future labor or materials estimated by the Defendant.

47. Defendant materially breached its duty to indemnify Plaintiff by withholding labor costs, as calculated by Defendant itself, associated with repairing or replacing Plaintiff's property in its ACV payments as depreciation.

7

### E. Labor Permissive Forms

48. Certain policies of insurance expressly allow for the depreciation of labor when calculating ACV under the RCLD methodology. The type of form or endorsement is referred to colloquially and herein as a "labor permissive form."

49. National Underwriter Company is a third-party publisher that publishes under the name "FC&S" (*a/k/a* "FIRE CASUALTY AND SURETY"), a comprehensive library of reference books for insurance professionals. FC&S also provides online bulletins in which its experts respond to questions from insurance professionals. The bulletin is used by insurance agents and brokers to interpret standard insurance policy provisions.

50. In 2014, FC&S took the position that depreciation should not apply to labor under the RCLD methodology unless a policy term explicitly states that it should, *i.e.*, a labor permissive form. FC&S BULLETIN, *Depreciation of Labor* (Nat'l Underwriting Co. Dec. 3, 2014).

51. After the 2014 FC&S bulletin, various Travelers underwriting companies have publicly filed labor permissive forms in the State of Wisconsin and elsewhere.

52. For example, on November 23, 2021, certain Traveler underwriting companies publicly filed a copyrighted endorsement with the Office of the Commissioner of Insurance allowing Travelers to "apply depreciation to all components of the estimated cost, including the following: a. Materials; b. Labor; c. Overhead and profit; and d. Any applicable tax." This and other exemplar labor permissive forms filed by Travelers in the State of Wisconsin are attached hereto at **Exhibit 8**.

53. The Policy did not include a labor permissive form or endorsement.

54. Because the Policy does not contain a labor permissive form or endorsement, future labor should not be withheld as depreciation when calculating the ACV of structural losses pursuant to the RCLD methodology.

55. Whether future labor is depreciable under a given labor permissive form – or whether labor is depreciable when the insurer wholly fails to endorse a property insurance policy with a labor permissive form – is a question of law for the Court. Under Wisconsin law, an appraisal panel may not interpret an insurance policy nor make legal determinations. *St. Croix Trading Co. / Direct Logistics, LLC v. Regent Ins. Co.*, 882 N.W.2d 487, 491 (Wis. Ct. App. 2016).

F. **Example of the Impact of Labor Depreciation on an ACV Payment**

56. The following example illustrates the differences between replacement cost value and actual cash value, the interplay between the two, and the role of depreciation and its impact on labor. Assume a residential home has a 10 year old asphalt shingle roof (with a normal life span of 20 years). Further assume that all of the shingles were properly installed at the time the policyholder buys actual cash value insurance coverage. Then, all of the properly-installed shingles are totally destroyed in a hailstorm.

57. Determining the replacement cost value is simple, *i.e.*, the cost to replace all damaged components of the roof with brand new materials. For purposes of the hypothetical, assume replacement cost to be an undisputed $30,000. To arrive at an actual cash value, the next step is to determine the proper depreciation. When determining the appropriate deduction for depreciation, it is critical to keep the goal of indemnity at the heart of the calculation, *i.e.*, to restore the insured to her pre-loss condition. To do this, the goal of course must be to give the insured what she had before the loss, which was a 10-year old properly installed roof. Actual cash value therefore requires payment of the value of 10-year old shingles already properly installed on the

9

roof, because the policyholder's shingles were already installed on the roof at the time of the loss. The shingles were not sitting in a garage.

58. This is accomplished as follows. First, the damaged ten-year old shingles have to be removed and disposed of, and that labor cost must be ascertained. Then the diminished value of 10-year old shingles at the time of the loss must be determined. Finally, the labor cost of re-installing shingles back to the same way they were installed before the loss must be calculated. This calculation puts the insured right back where she was before the loss (a residential home with installed shingles minus the full cost of the pre-loss wear and tear of the shingles). The policyholder in this hypothetical is not receiving replacement cost coverage because he or she must fully pay, out of his or her own pocket, the delta between 10-year-old shingles and brand new shingles. The concept of physical depreciation therefore fairly penalized the policyholder for *all* of the roof materials' pre-loss wear and tear.

59. Of course, in the real world, there is no market for 10-year-old shingles and there is no store that a person can visit to purchase "used" 10-year-old shingles. As a result, the concept of depreciation was born to hypothetically determine what the cost of those materials would be. In the above hypothetical, if we simplistically assumed the cost of the $30,000 roof was half labor ($15,000) and half materials ($15,000), then the proper ACV payment would be 100% of the labor costs ($15,000) and half of the material costs due to the 50% depreciation of the shingles ($7,500), resulting in a total ACV payment of $22,500. In contrast, if labor was also depreciated by 50%, the ACV payment would decrease to $15,000.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
### (DEPRECIATION OF LABOR FROM ACV PAYMENT)

60. Plaintiff restates and incorporates by reference the previous paragraphs as if fully stated in this Count.

61. Defendant entered into a contract with Plaintiff. The Policy governs the relationship between Defendant and Plaintiff and the manner in which claims for covered losses are handled.

62. The Policy is a binding contract under Wisconsin law and is supported by valid consideration in the form of premium payments in exchange for insurance coverage.

63. Defendant drafted the Policy.

64. Defendant breached the Policy by improperly withholding future labor (in an amount as calculated by Defendant itself) as depreciation when calculating Plaintiff's ACV payment under the RCLD methodology.

65. Defendant's actions damaged Plaintiff.

66. Defendant's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiff. More specifically, Plaintiff received payment for its losses in an amount less than to which it was entitled to under the Policy.

67. In light of the foregoing, Plaintiff is entitled to recover damages sufficient to make it whole for all amounts unlawfully withheld from its ACV payment, including prejudgment interest as may be allowed by law for the periods of withholding.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Award compensatory damages for all labor costs improperly withheld from Plaintiff's ACV payment as depreciation, plus prejudgment interest on all such sums;

2. Award costs, expenses, and disbursements incurred herein by Plaintiff;

3. Pre-judgment interest at the statutory rate of 12% per annum;

4. Post-Judgment interest; and

5. Grant such further and additional relief as the Court deems necessary and proper.

Dated: March 16, 2023

McWHERTER SCOTT & BOBBITT, PLC

*s/ J. Brandon McWherter*
J. Brandon McWherter
McWHERTER SCOTT & BOBBITT, PLC
341 Cool Springs Blvd., Suite 230
Franklin, TN 37067
Tel: (615) 354-1144
brandon@msb.law

T. Joseph Snodgrass
SNODGRASS LAW LLC
100 S. Fifth St., Suite 800
Minneapolis, MN 55402
Tel: (612) 448-2600
jsnodgrass@snodgrass-law.com

*Attorneys for Plaintiff*